# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **GERALD LANE** ) | |
| **7096 Missy Park Court** ) | |
| **Dublin, Ohio 43017** ) | |
| ) | |
| **Plaintiff,** ) | **Civil Action No.: 2:18-cv-164** |
| ) | |
| **v.** ) | |
| ) | **Judge** |
| **DAVOL INC.** ) | |
| **100 Sockanosset Crossroad** ) | **Magistrate Judge** |
| **Cranston, Rhode Island 02920** ) | |
| ) | |
| **Serve Also Its Registered Agent** ) | |
| **CT Corporation System** ) | |
| **4400 Easton Commons Way** ) | |
| **Suite 125** ) | **JURY TRIAL DEMANDED** |
| **Columbus, Ohio 43219** ) | |
| ) | |
| **And** ) | |
| ) | |
| **C.R. BARD, INC.** ) | |
| **730 Central Avenue** ) | |
| **Murray Hill, New Jersey 07974** ) | |
| ) | |
| **Serve Also Its Registered Agent** ) | |
| **CT Corporation System** ) | |
| **4400 Easton Commons Way** ) | |
| **Suite 125** ) | |
| **Columbus, Ohio 43219** ) | |
| ) | |
| **Defendants.** ) | |

Plaintiff, by and through his undersigned counsel, brings this Complaint for damages against Defendants and in support thereof states the following:

1.　　This is a device tort action brought on behalf of the above named Plaintiff arising out of the failure of the Defendants' hernia mesh product. As a result, Plaintiff Gerald Lane suffered permanent injuries and significant pain and suffering, emotional distress, lost wages and

earning capacity, and diminished quality of life. The Plaintiff respectfully seeks all damages to which Plaintiff may be legally entitled.

## STATEMENT OF PARTIES

2.　　Plaintiff is, and was, at all relevant times, a citizen and resident of Franklin County, Ohio.

3.　　Davol, Inc. ("Davol") is incorporated in Delaware and has its principal place of business in Rhode Island. Davol is a medical device company involved in the research, development, testing, manufacture, production, marketing, promotion and/or sale of medical devices including a convex hernia mesh made of polypropylene known as the Bard Mesh 3DMax ("3DMax") and a hernia mesh composed of polypropylene, and polyglycolic acid (PGA) fibers coated with Sepra Technology, a bioresorbable, chemically modified sodium hyalurnate, carboxymethylcellulose, and polyethylene glycol based hydrogel ("Ventralex ST") (3DMax and Ventralex ST collectively referred to as "Bard Hernia Mesh").

4.　　C.R. Bard, Inc. ("Bard") is incorporated and based in New Jersey. Bard is a multinational marketer, promoter, seller, producer, manufacturer, and developer of medical devices. Bard controls the largest market share of the hernia mesh market. Bard is the corporate parent/stockholder of Davol and participates in the manufacture and distribution of Bard Hernia Mesh. It also manufactures and supplies Davol with material that forms part of the Bard Hernia Mesh.

5.　　Bard is, at all times relevant hereto, responsible for the actions of Davol and exercises control over Davol's functions specific to the oversight and compliance with applicable safety standards relating to and including Bard Hernia Mesh sold in the United States. In such

2

capacity, they committed or allowed to be committed tortious and wrongful acts, including the violation of numerous safety standards relating to device manufacturing, quality assurance/control, and conformance with design and manufacturing specifications. Their misfeasance and malfeasance caused Plaintiff to suffer injury and damages.

6.     Defendants are individually, jointly and severally liable to Plaintiff for damages suffered by Plaintiff arising from the Defendants' design, manufacture, marketing, labeling, distribution, sale and placement of its defective Bard Hernia Mesh at issue in the instant suit, effectuated directly and indirectly through their respective agents, servants, employees and/or owners, all acting within the course and scope of their representative agencies, services, employments and/or ownership.

7.     Defendants are vicariously liable for the acts and/or omissions of their employees and/or agents who were at all times relevant hereto acting on behalf of Defendants and within the scope of their employment or agency with Defendants.

## VENUE AND JURISDICTION

8.     This Court has personal jurisdiction over Defendants Davol and Bard pursuant to O.R.C. § 2307.382 in that the plaintiff's causes of action against these Defendants arise from the Defendants' transaction of business in this State and/or their commission of tortious acts in this State as described herein.

9.     This Court has diversity subject matter jurisdiction over this case pursuant to 28 U.S.C § 1332.

10.     Venue is proper in the Southern District of Ohio pursuant to 28 U.S.C. § 1391 because the events or omissions giving rise to plaintiff's claims occurred in this district.

11.     Defendants have and continue to conduct substantial business in the State of Ohio and in this District, distribute Bard Hernia Mesh in this District, receive substantial compensation and profits from sales of Bard Hernia Mesh in this District, and made material omissions and misrepresentations and breaches of warranties in this District, so as to subject them to *in personam* jurisdiction in this District.

## FACTS COMMON TO ALL COUNTS

12.     On or about November 17, 2014, Plaintiff Gerald Lane underwent right inguinal and umbilical hernia repair by Dr. Robert Toscano at Knightbridge Surgery Center in Columbus, Ohio. A Large 3DMax, Ref No. 0115321, Lot No. HUYI2055 and a 4.3 cm circular Ventralex ST Ref. No. 5950007, Lot No. HUYI0045 were implanted in Plaintiff during this repair.

13.     Defendants, manufactured, sold, and/or distributed Bard Hernia Mesh to Plaintiff, through Plaintiff's doctors, to be used for treatment of hernia repair.

14.     On or about February 26, 2016 Plaintiff Gerald Lane underwent right epididymectomy and partial vas removal due to chronic right epididymal pain status post right inguinal hernia repair with the Defendants' 3DMax. The operation was performed by Dr. Michael D. Jordan at Memorial Hospital in Marysville, Ohio.

15.     On or about August 11, 2016, Plaintiff Gerald Lane underwent removal of the failed 3DMax by Dr. Bryan Grischow at Mount Carmel St. Ann's in Westerville, Ohio. Upon visualizing the 3DMax, Dr. Grischow noted "the mesh which was intimately adhered to the anterior abdominal wall, spermatic cord and epigastric vessels. Meticulous dissection (lasting over 45 minutes) assay was undertaken to eventually excised the mesh from surrounding abdominal wall structures."

16.     On or about December 29, 2016, Plaintiff Gerald Lane underwent removal of the failed Ventralex ST by Dr. Bryan Grischow at Mount Carmel St. Ann's in Westerville, Ohio. Dr. Grischow noted "male who I had seen previously regarding severe right groin pain status post laparoscopic inguinal and umbilical herniorrhaphy at an outside facility. After exhaustive workup, we presented to the operating room for right groin exploration. At that time, he was found to have multiple abnormalities consistent with chronic inflammatory changes which resulted in mesh removal. Upon completion of that procedure, he had near resolution of his preoperative symptoms. Since then, he has been complaining of periumbilical discomfort similar to what he was feeling in the groin. As a result, we presented to the operating room today for diagnostic laparoscopy to evaluate the umbilical mesh to see if he is having similar reactive changes. Intraoperatively, there was in fact found to be impressive inflammatory changes, especially in the areas of his abdominal wall where he was complaining of preoperatively. This was addressed with mesh removal and steroid injection into the more inflamed portions of his abdominal wall."

17.     Plaintiff Gerald Lane continues to suffer significant pain.

18.     Defendants' Bard Hernia Mesh product contains polypropylene. Despite claims that this material is inert, a substantial body of scientific evidence shows that this mesh material is biologically incompatible with human tissue and promotes an immune response in a large subset of the population receiving these products. This immune response promotes degradation and contracture of the polypropylene mesh, as well as the surrounding tissue, and can contribute to the formation of severe adverse reactions to the mesh.

19.     Upon information and belief, Defendants' numerous suppliers, of various forms of polypropylene, cautioned all users in their United States Material Safety Data Sheet that the polypropylene was not to be used for medical applications involving permanent implantation in the human body or permanent contact with internal body fluids or tissues.

20.     Defendants failed to warn or notify doctors, regulatory agencies, and consumers of the severe and life-threatening risks associated with polypropylene.

21.     Defendants' Bard Hernia Mesh can contract up to 70% post implantation.

22.     Defendants were responsible for the research, design, development, testing, manufacture, production, marketing, promotion, distribution and sale of Bard Hernia Mesh, including providing the warnings and instructions concerning the product.

23.     Among the intended purposes for which Defendants designed, manufactured and sold Bard Hernia Mesh was use by surgeons for hernia repair surgeries, the purpose for which Bard Hernia Mesh was implanted in Plaintiff.

24.     Defendants represented to Plaintiff and Plaintiff's physicians that Bard Hernia Mesh was a safe and effective product for hernia repair.

**ESTOPPEL AND TOLLING OF STATUTE OF LIMITATIONS**

25.     Plaintiff incorporates herein by reference the allegations in all prior paragraphs as if fully set forth herein.

26.     Plaintiff asserts all applicable state statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including equitable tolling, class action tolling, delayed discovery, discovery rule, and fraudulent concealment.

27.     Plaintiff pleads that the discovery rule should be applied to toll the running of the statute until Plaintiff knew, or through the exercise of reasonable care and diligence should have

known, of facts indicated that Plaintiff had been injured, the cause of the injury, and the tortious nature of the wrongdoing that caused the injury.

28.     Despite diligent investigation by Plaintiff into the cause of Plaintiff's injuries, including consultations with Plaintiff's medical providers, the nature of Plaintiff's injuries and damages, and their relationship to Bard Hernia Mesh was not discovered, and through reasonable care and diligence could not have been discovered until a date within the applicable statute of limitations for filing Plaintiff's claims. Therefore, under appropriate application of the discovery rule, Plaintiff's suit was filed well within the applicable statutory limitations period.

29.     The running of the statute of limitations in this cause of action is tolled due to equitable tolling. Defendants are estopped from asserting a statute of limitations defense due to Defendants' fraudulent concealment, through misrepresentations and omissions, from Plaintiff and Plaintiff's physicians of the true risks associated with Bard Hernia Mesh. As a result of Defendants' fraudulent concealment, Plaintiff and Plaintiff's physicians were unaware, and could not have known or have learned through reasonable diligence that Plaintiff had been exposed to the risks alleged herein and that those risks were the direct and proximate result of the wrongful acts and omissions of the Defendants.

## COUNT I: STRICT LIABILITY – MANUFACTURING DEFECT

30.     Plaintiff incorporates herein by reference the allegations in all prior paragraphs as if fully set forth herein.

31.     Defendants expected and intended Bard Hernia Mesh to reach users such as Plaintiff in the condition in which the product was sold.

32.     The implantation of Bard Hernia Meshes in Plaintiff's body was medically reasonable, and was a type of use that Defendants intended and foresaw when it designed, manufactured and sold the product.

33.     At the time the Bard Hernia Meshes were implanted in Plaintiff's body, the products were defectively manufactured.

34.     Defendants' poor quality control and general non-compliance resulted in the non-conformance of the Bard Hernia Meshes implanted in Plaintiff. The Bard Hernia Meshes implanted in Plaintiff did not conform to the Defendants' intended manufacturing and design specifications.

35.     Upon information and belief, Defendants utilized substandard and adulterated polypropylene in Bard Hernia Mesh, which deviated from Defendants' material and supply specifications.

36.     As a direct and proximate result of the defective manufacture of Bard Hernia Mesh, Plaintiff suffered injuries and damages as summarized herein.

## COUNT II: STRICT LIABILITY – DESIGN DEFECT

37.     Plaintiff incorporates herein by reference the allegations in all prior paragraphs as if fully set forth herein.

38.     Defendants' Bard Hernia Mesh was defectively designed and/or manufactured, was not reasonably safe for its intended use in hernia repair, and the risks of the design outweighed any potential benefits associated with the design. As a result of the defective design and/or manufacture of Bard Hernia Mesh, there was an unreasonable risk of severe adverse reactions to the mesh or mesh components including: chronic pain; recurrence of hernia; foreign

body response; rejection; infection; scarification; improper wound healing; excessive and chronic inflammation; allergic reaction; adhesions to internal organs; erosion; abscess; fistula formation; granulomatous response; seroma formation; nerve damage; tissue damage and/or death; and other complications.

39.     The 3DMax includes a cupped or curved design, which causes the mesh to curl, wrinkle, and/or fold onto itself as the mesh contracts.

40.     The anatomical shape of the 3DMax results in dense adhesions forming around internal structures, such as veins, ligaments, nerves, and more. When the 3DMax fails and complications arise, the mesh can not be easily or safely removed due to the entrapment of numerous delicate internal structures.

41.     When affixed to the body's tissue, the impermeable coating of the Ventralex ST prevents fluid escape, which leads to seroma formation, and which in turn can cause infection or abscess formation and other complications.

42.     The Ventralex ST coating provides an ideal bacteria breeding ground in which bacteria cannot be eliminated by the body's immune response, thus allowing infection to proliferate.

43.     Defendants utilize Ethylene Oxide ("ETO") in an attempt to sterilize the Ventralex ST. Although ETO is an effective disinfectant, dry spores are highly resistant to ETO. Moisture must be present to eliminate spores if ETO is used. Presoaking the product to be sterilized is most desirable, but high levels of humidity during the ETO process can also be effective in eliminating spores.

44.     The ST Mesh, containing spores, will eventually cause an infection after implantation. The spores can remain dormant for extended periods of time, resulting in infections months or years after ST Mesh was implanted. The following literature discusses the necessity of moisture during ETO sterilization:

A.     In January of 1989, a review on sterilization methods of medical devices was published in the Journal of Biomaterials Applications. ETO was among the sterilization methods reviewed. **ETO was noted to be highly resistant to dry spores, moisture must be present; presoaking most desirable. Experiments demonstrated the importance of the state of humidification of organisms at the time of their exposure to ETO. Desiccation of the spores prior to ETO exposure produces a small but significant percentage of organisms which are highly resistant to the sterilization process. Similar resistance to destruction by ETO occurs in desiccated staphylococcus aureus. Rehumidification of such organisms can require prolonged exposure to an atmosphere having a 50 to 90 percent relative humidity. Moisture has been found to be a critical factor in achieving sterility with gaseous ETO. No gas sterilizer can effectively kill desiccated spores.**

Dempsey, D.J. and Thirucote, R.R., *Sterilization of medical devices: A Review*. Journal of Biomaterials Applications, 3(3), pp. 454-523 (1988). DOI: 10.1177/088532828800300303

45.     Defendants' Ventralex ST Mesh is acidic, causing bacteriostasis (inhibition of the growth of bacteria without killing the bacteria), and resulting in the inability to properly validate sterilization.

46.     The coating of the Ventralex ST is cytotoxic, immunogenic, and non-biocompatible, causing or contributing to complications such as delayed wound healing, inflammation, foreign body response, rejection, infection, and other complications.

47.     The coating of the Ventralex ST is designed and intended to resorb in less than 30 days.

48.     When the Ventralex ST coating is disrupted, degrades, and/or resorbs, the "naked" polypropylene mesh and polyglycolic acid (PGA) are exposed to the adjoining tissue and viscera. The mesh can thus become adhered to organs and cause incarceration of organs, and fistula formation.

49.     The solid, flat, relatively smooth and continuous surface of Defendants' Ventralex ST inhibits the body's ability to clear toxins.

50.     Defendants' Ventralex ST also includes an inner ring of polydioxanone (PDO ring), to aid in the memory and stability of the device. The inner PDO ring is called SorbaFlex Memory Technology. Once implanted, the PDO ring breaks down via hydrolysis over a period of at least 6 to 8 months. The PDO ring elicits an intense inflammatory response during absorption.

51.     The Ventralex ST is vulnerable to buckling, folding, and/or migrating once the PDO ring has absorbed.

52.     Defendants secure the ST coating to the polypropylene base of the Ventralex ST by suturing two circular rings of PGA. The two securing circular rings of PGA are not ST coated and are the closest part of the mesh to underlying organs once implanted. This results in significant amounts of bare PGA being exposed to underlying organs at the time of implantation.

53.     The two circular rings of PGA securing the ST coating to the polypropylene have a tendency to come unstitched, resulting in segments of PGA protruding toward the underlying organs.

54.     The method by which Defendants secure the ST coating to the polypropylene base of the mesh does not provide adequate or uniform coverage to the outer aspects of the base polypropylene from the time of implantation.

55. The securing circular rings of PGA do not extend to the outer aspects of the polypropylene base, which can result in the ST coating folding upon itself and exposing bare polypropylene.

56. The positioning/securing strap of the Ventralex ST is bare polypropylene without an ST coating.

57. The Instructions for Use for the Ventralex ST Mesh direct the implanting surgeon to secure it with tacks or sutures through the polypropylene positioning straps.

58. The polypropylene positioning straps have a tendency to tear at the base of the Ventralex ST Mesh after implantation, resulting in mesh migration and other injuries.

59. The polypropylene positioning straps have a tendency to tear where tacked or sutured, resulting in mesh migration and other injuries.

60. The additional layers utilized to create the patch of the Ventralex ST increases the intensity and duration of inflammation and foreign body response.

61. Mesh porosity impacts tissue ingrowth and the inflammatory response. Mesh pore size should be at least 3mm. Pore sizes smaller than 3mm decreases tissue incorporation, increases inflammation, and results in a fibrotic reaction. Bard Hernia Mesh has a mesh pore size of 0.8mm.

62. The polypropylene weave of Bard Hernia Mesh produces very small interstices which allow bacteria to enter and hide from the host defenses designed to eliminate them. The bacteria can secrete an encasing slime (biofilm) which further serves to protect them from destruction by white blood cells and macrophages.

63.     Observation of mesh under the scanning electron microscope reveals that very small interstices exist between Bard Hernia Mesh mesh fibrils, which are too small for a macrophage to enter to destroy incubating bacteria. Some bacteria are capable of degrading polypropylene.

64.     Bard Hernia Mesh utilizes heavyweight polypropylene, which further increases inflammation and foreign body response.

65.     These manufacturing and design defects associated with Bard Hernia Mesh were directly and proximately related to the injuries suffered by Plaintiff.

66.     Neither Plaintiff nor Plaintiff's implanting physician were adequately warned or informed by Defendants of the defective and dangerous nature of Bard Hernia Mesh. Moreover, neither Plaintiff nor Plaintiff's implanting physician were adequately warned or informed by Defendants of the risks associated with Bard Hernia Mesh.

67.     The Bard Hernia Meshes implanted in Plaintiff failed to reasonably perform as intended. The Bard Hernia Meshes caused serious injury and had to be surgically removed via invasive surgery, and necessitated additional invasive surgery to repair the hernia that the Bard Hernia Meshes were initially implanted to treat.

68.     At the time the Bard Hernia Meshes were implanted in Plaintiff's body, the product was defectively designed. As described above, there was an unreasonable risk that the Bard Hernia Meshes would not perform safely and effectively for the purposes for which they were intended, and Defendants failed to design against such dangers, and failed to provide adequate warnings and instructions concerning these risks.

69.     Defendants expected and intended Bard Hernia Mesh to reach users such as Plaintiff in the condition in which the Bard Hernia Mesh was sold.

70.     The implantation of Bard Hernia Meshes in Plaintiff's body was medically reasonable, and was a type of use that Defendants intended and foresaw when it designed, manufactured and sold the Bard Hernia Mesh.

71.     The risks associated with the 3DMax significantly outweigh any benefits that Defendants contend could be associated with 3DMax. The curved design, which is not used in any other hernia mesh product sold in the United States, promotes mesh deformation and migration, and incites an intense inflammatory response, leading to encapsulation, deformation, scarification and contraction, erosion, rejection and further migration.

72.     The risks associated with the Ventralex ST significantly outweigh any benefits that Defendants contend could be associated with the product. The ST coating—which is not used in any other hernia mesh product sold in the United States—incites an intense inflammatory response, leading to encapsulation, deformation, scarification and contraction, migration, erosion and rejection. The impermeable ST coating leads to seroma formation, and provides a breeding ground for infection by protecting bacteria from being eliminated through the body's natural immune response. This ST coating also causes immunogenic responses, and was known to be cytotoxic.

73.     The polypropylene mesh utilized to manufacture Bard Hernia Mesh was in itself dangerous and defective, particularly when used in the manner intended by Defendants. The particular polypropylene material used in Bard Hernia Mesh was substandard, adulterated and non-medical grade, and was unreasonably subject to oxidative degradation within the body.

When implanted adjacent internal organs, structures, nerves, arteries, and vessels, as Defendants intended for Bard Hernia Mesh, polypropylene mesh is unreasonably susceptible to adhesion formation, nerve entrapment, spermatic cord obliteration, organ perforation or erosion, fistula formation and bowel strangulation or hernia incarceration, and other injuries.

74.     The appropriate treatment for complications associated with Bard Hernia Mesh involves additional invasive surgery to remove the mesh from the body, thus eliminating any purported benefit that the mesh was intended to provide to the patient.

75.     At the time Bard Hernia Mesh was implanted in Plaintiff, there were safer feasible alternative designs for hernia mesh products, including but not limited to, a flat, non-coated, single-layer, porous mesh, or a fully resorbable mesh.

76.     The 3DMax cost significantly more than competitive products because of its unique curved shape, even though the curved shape provided no benefit to consumers, and increased the risks to patients implanted with these devices.

77.     The Ventralex ST costs significantly more than competitive products due to its unique ST coating, even though the ST coating provided no benefit to consumers, and increased the risks to patients implanted with these devices.

78.     The Bard Hernia Meshes implanted in Plaintiff failed to reasonably perform as intended, and had to be surgically removed necessitating further invasive surgery to repair the very issue that the product was intended to repair, and thus provided no benefit to him.

79.     As a direct and proximate result of the defective and unreasonably dangerous condition of the product, Plaintiff suffered injuries and damages as summarized herein.

### COUNT III: STRICT LIABILITY – FAILURE TO WARN

15

80.     Plaintiff incorporates herein by reference the allegations in all prior paragraphs as if fully set forth herein.

81.     At the time the Bard Hernia Meshes were implanted in Plaintiff's body, the warnings and instructions provided by Defendant for Bard Hernia Meshes were inadequate and defective. As described above, there was an unreasonable risk that the products would not perform safely and effectively for the purposes for which they were intended, and Defendants failed to design and/or manufacture against such dangers, and failed to provide adequate warnings and instructions concerning these risks.

82.     Defendants expected and intended Bard Hernia Mesh to reach users such as Plaintiff in the condition in which the product was sold.

83.     Plaintiff and Plaintiff's physicians were unaware of the defects and dangers of Bard Hernia Mesh, and were unaware of the frequency, severity and duration of the risks associated with Bard Hernia Mesh.

84.     The Defendants' Instructions for Use provided with the 3DMax are silent on the fact that the 3DMax has a propensity to shrink, wrinkle, fold, and/or contort after implantation. Defendants provided no warning to physicians about the risks or increased risks specifically associated with the unique curved design of the 3DMax.

85.     Defendants' Instructions for Use provided with the Ventralex ST expressly understate and misstate the risks known to be associated specifically with the product, representing the associated complications such as inflammation merely as "possible complications." But the Ventralex ST will always incite severe inflammation once implanted.

16

The inflammation caused by the Ventralex ST is chronic in nature and systemic, not acute localized inflammation.

86.     No other surgical mesh sold in the United States has the dangerous and defective ST coating, which itself causes or increases the risks of numerous complications, including increased risk of seroma formation, immunologic response, increased risk for infection, and increased inflammatory reaction and foreign body response. Defendants provided no warning to physicians about the risks or increased risks specifically associated with the unique design of the Ventralex ST.

87.     The Defendants' Instructions for Use for Bard Hernia Mesh failed to adequately warn Plaintiff's physicians of numerous risks which Defendants knew or should have known were associated with Bard Hernia Mesh, including the risks of the product's immunologic response, pain, encapsulation, rejection, migration, scarification, contraction, adhesion to internal structures or organs, erosion and migration through adjacent tissue and viscera, bowel obstruction, infection, or hernia incarceration or strangulation.

88.     Defendants failed to adequately train or warn Plaintiff or Plaintiff's physicians about the necessity for invasive surgical intervention in the event of complications with Bard Hernia Mesh, or how to properly treat such complications when they occurred.

89.     Defendants failed to adequately warn Plaintiff or Plaintiff's physicians that the surgical removal of Bard Hernia Mesh in the event of complications would leave the hernia unrepaired, the resulting hernia would be much larger than the original, and would necessitate further, more complicated medical treatment to attempt to repair the same hernia that the failed Bard Hernia Mesh was intended to treat.

90.     Defendants represented to physicians, including Plaintiff's physician, that the curved design would prevent or reduce recurrences and pain, and expressly intended for Bard Hernia Mesh to be implanted near numerous large nerves and organs, and marketed and promoted Bard Hernia Mesh for said purpose. Defendants failed to warn physicians that Bard Hernia Mesh would contract over time, increase the rates of recurrence and the ability of Bard Hernia Mesh to migrate.

91.     With respect to the complications that were listed in the Defendants' warnings, Defendants provided no information or warning regarding the frequency, severity and duration of those complications, even though the complications associated with Bard Hernia Mesh were more frequent, more severe and lasted longer than those with safer feasible alternative hernia repair treatments.

92.     If Plaintiff and/or Plaintiff's physicians had been properly warned of the defects and dangers of Bard Hernia Mesh, and of the frequency, severity and duration of the risks associated with the Bard Hernia Mesh, Plaintiff would not have consented to allow Bard Hernia Mesh to be implanted, and Plaintiff's physicians would not have implanted Bard Hernia Meshes in Plaintiff.

93.     As a direct and proximate result of the inadequate and defective warnings and instructions, Plaintiff suffered injuries and damages as summarized herein.

## COUNT IV: NEGLIGENCE

94.     Plaintiff incorporates herein by reference the allegations in all prior Paragraphs as if fully set forth herein.

95. Defendants had a duty to use reasonable care in designing, testing, inspecting, manufacturing, packaging, labeling, marketing, distributing, and preparing written instructions and warnings for Bard Hernia Mesh, but failed to do so.

96. Defendants knew, or in the exercise of reasonable care should have known, that Bard Hernia Mesh was defectively and unreasonably designed and/or manufactured, and was unreasonably dangerous and likely to injure patients in whom Bard Hernia Mesh was implanted. Defendants knew or should have known that Plaintiff and Plaintiff's physicians were unaware of the dangers and defects inherent in Bard Hernia Mesh.

97. Defendants knew or should have known that the Material Data Safety Sheet for the polypropylene used to manufacturer its Bard Hernia Mesh prohibited permanently implanting the polypropylene into the human body.

98. Defendants utilized non-medical grade polypropylene for Bard Hernia Mesh.

99. Defendants knew or should have known that polypropylene is not inert and would degrade, flake, chip, and disperse throughout the body once implanted.

100. Defendants knew or should have known that polypropylene incites a severe inflammatory response once implanted and continues to incite a severe inflammatory response indefinitely or until removed.

101. Defendants knew or should have known that every piece of polypropylene that flakes off and migrates throughout the body also incites its own chronic inflammatory response wherever it embeds.

102. Defendants knew or should have known that PGA (polyglycolic acid) induces an intense local inflammatory response following implantation.

103.    Defendants knew or should have known that carboxymethylcellulose induces an intense local inflammatory response following implantation.

104.    Defendants knew or should have known of the cytotoxic and immunogenic properties of the coating on the Ventralex ST Mesh before introducing it into the stream of commerce.

105.    Defendants knew or should have known that the curved design of the 3DMax would promote mesh deformation and migration.

106.    Defendants knew or should have known of the significant risk of complications if Bard Hernia Mesh is implanted to repair a hernia. Nonetheless, Defendants marketed Bard Hernia Mesh as being safe and effective for hernia repair.

107.    Defendants knew or should have known that small pore size and the heavyweight polypropylene of Bard Hernia Mesh would increase mesh surface area and foreign body load, which would increase the inflammatory and foreign body response.

108.    As a direct and proximate result of Defendants' negligence in designing, testing, inspecting, manufacturing, packaging, labeling, marketing, distributing, and preparing written instructions and warnings for Bard Hernia Mesh, Plaintiff suffered injuries and damages as summarized herein.

## COUNT V: BREACH OF EXPRESS WARRANTY

109.    Plaintiff incorporates herein by reference the allegations in all prior paragraphs as if fully set forth herein.

110.    At all relevant and material times, Defendants manufactured, marketed, sold, distributed and otherwise placed in to the stream of commerce the Bard Hernia Mesh.

111.    In advertising, marketing and otherwise promoting Bard Hernia Mesh to physicians, hospitals and other healthcare providers, Defendants expressly warranted that their Bard Hernia Mesh was safe for use and reasonably fit for their intended purposes. In advertising, marketing and otherwise promoting Bard Hernia Mesh, Defendants' intended that physicians, hospitals and other healthcare providers rely upon their representations regarding safety and fitness in an effort to induce them to implant Bard Hernia Mesh in their patients.

112.    With respect to the Plaintiff, Defendants intended that Bard Hernia Mesh be implanted by Plaintiff's treating surgeon in a reasonable and foreseeable manner in which it was implanted and in accordance with the instructions for use and product specifications provided by Defendants. The Plaintiff was in privity with Defendants.

113.    Defendants expressly warranted to physicians, hospitals, other healthcare providers and the general public including Plaintiff that Bard Hernia Mesh was safe and fit for use by consumers, that it was of merchantable quality, that its risks, side effects and potential complications were minimal and comparable to other hernia mesh products, that it was adequately researched and tested, and that it was fit for its intended use. Plaintiff and Plaintiff's physicians and healthcare providers reasonably relied upon Defendants' express representations and warranties, and consequently, Plaintiff was implanted with Defendants' Bard Hernia Mesh.

114.    Defendants expressly warranted to physicians, hospitals, other healthcare providers and the general public including Plaintiff that Bard Hernia Mesh safe and fit for use for the repair of both groin and abdominal hernia.

115.    Bard Hernia Mesh was represented by the Defendants to prevent or minimize hernia recurrence and pain, and to facilitate incorporation of the mesh into the body, but it did

not. Instead, Bard Hernia Mesh caused an intense systemic inflammatory and chronic foreign body response, resulting in an adverse tissue reaction including damage to surrounding tissue in the form of sclerotic, granulomatous and/or fibrotic tissue and improper or delayed healing.

116. Defendant breached these express warranties because Bard Hernia Mesh implanted in Plaintiff was unreasonably dangerous, defective, and not as Defendants had represented.

117. Defendants breached express representations and warranties made to the Plaintiff, as well as Plaintiffs physicians and healthcare providers, with respect to Bard Hernia Mesh, including, but not limited to, the following particulars:

A. Defendants represented to Plaintiff and Plaintiff's physicians and healthcare provides through labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions among other ways that the Defendants' Bard Hernia Mesh was safe, meanwhile Defendants fraudulently withheld and concealed information about the substantial risks of serious injury associated with using Bard Hernia Mesh.

B. Defendants represented to Plaintiff and their physicians and healthcare providers that the Defendants' Bard Hernia Mesh was as safe and/or safer than other alternative procedures and devices on the market, meanwhile Defendants fraudulently concealed information that demonstrated that Bard Hernia Mesh was not safer than alternative therapies and products available on the market; and

C. Defendants represented to Plaintiff and Plaintiff's physicians and healthcare providers that the Defendants' Bard Hernia Mesh was more efficacious than other alternative

procedures, therapies and/or devices, meanwhile Defendants fraudulently concealed information, regarding the true efficacy of Bard Hernia Mesh.

118. Defendants' breach of their express warranties resulted in the implantation of an unreasonably dangerous and defective product into the Plaintiff, placing Plaintiff's health and safety in jeopardy

119. At the time of making such express warranties, Defendants knew or should have known that Defendants' Bard Hernia Mesh does not conform to the express warranties and Defendants' acts were motivated by financial gain while the adverse consequences of Defendants' conduct was outrageous, fraudulent, oppressive, done with malice or gross negligence and evidenced reckless indifference to Plaintiff's rights, health and safety so as to warrant the imposition of punitive damages.

## COUNT VI: VIOLATION OF CONSUMER PROTECTION LAWS

120. Plaintiff incorporates herein by reference the allegations in all prior paragraphs as if fully set forth herein.

121. Plaintiff purchased and used the Defendants' Bard Hernia Mesh primarily for personal use and thereby suffered ascertainable losses as a result of Defendants' actions in violation of the consumer protection laws.

122. Had Defendants not engaged in the deceptive conduct described herein, Plaintiff would not have purchased and/or paid for the Defendants' Bard Hernia Mesh, and would not have incurred related medical cost and injury.

123.    Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, moneys from Plaintiff for Bard Hernia Mesh that would not have been paid had Defendants not engaged in unfair and deceptive conduct.

124.    Unfair methods of competition or deceptive acts or practices that were proscribed by law, including the following:

A)  Representing that goods or services have characteristics, ingredients, uses, benefits or qualities that they do not have;

B)  Advertising goods or services with the intent not to sell them as advertised; and,

C)  Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

125.    Plaintiff was injured by the cumulative and indivisible nature of Defendants' conduct. The cumulative effect of Defendants' conduct directed at patients, physicians and consumers was to create demand for and sell the Defendants' Bard Hernia Mesh. Each aspect of Defendants' conduct combined to artificially create sales of the Defendants' Bard Hernia Mesh.

126.    Defendants have a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of the Defendants' Bard Hernia Mesh.

127.    Had Defendants not engaged in the deceptive conduct described above, Plaintiff would not have purchased and/or paid for Bard Hernia Mesh, and would not have incurred related medical cost.

128. Defendants' deceptive, unconscionable, or fraudulent representations and material omissions to patients, physicians and consumers, including Plaintiff, constituted unfair and deceptive acts and trade practices in violation of the state consumer protection statutes listed.

129. Defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts, or trade practices in violation of state consumer protection statues, as listed below.

130. Defendants have engaged in unfair competition or unfair or deceptive acts or trade practices or have made false representations.

- 15 U.S.C. § 2301-2312 (1982)

- R.I. Gen. Laws § 6-13.1, *et. seq.*

- N.J. Stat. Ann § 56:8-1, *et. seq.*

- Ohio Rev. Code §1345.01 *et. seq.*

131. Under the statutes listed above to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising, Defendants are the suppliers, manufacturers, advertisers, and sellers, who are subject to liability under such legislation for unfair, deceptive, fraudulent and unconscionable consumer sales practices.

132. Defendants violated the statutes that were enacted in these states to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising, by knowingly and falsely representing that the Defendants' Bard Hernia Mesh was fit to be used for the purpose for which they were intended, when in fact they were defective and dangerous, and by other acts alleged herein. These representations were made in marketing and promotional materials.

25

133. The actions and omissions of Defendants alleged herein are uncured or incurable deceptive acts under the statutes enacted in the states to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising.

134. Defendants had actual knowledge of the defective and dangerous condition of the Defendants' Bard Hernia Mesh and failed to take any action to cure such defective and dangerous conditions.

135. Plaintiff and the medical community relied upon Defendants' misrepresentations and omissions in determining which product and/or procedure to undergo and/or perform (if any).

136. Defendants' deceptive, unconscionable or fraudulent representations and material omissions to patients, physicians and consumers, constituted unfair and deceptive acts and practices.

137. By reason of the unlawful acts engaged in by Defendants, and as a direct and proximate result thereof, Plaintiff has suffered ascertainable losses and damages.

138. As a direct and proximate result of Defendants' violations of the states; consumer protection laws, Plaintiff has sustained economic losses and other damages and is entitled to statutory and compensatory damages in an amount to be proven at trial.

## COUNT VII: GROSS NEGLIGENCE

139. Plaintiff incorporates herein by reference the allegations in all prior paragraphs as if fully set forth herein.

140. The wrongs done by defendants were aggravated by the kind of malice, fraud, and grossly negligent disregard for the rights of others, the public, and Plaintiff for which the law

would allow, and which Plaintiff will seek at the appropriate time under governing law for the imposition of exemplary damages, in that Defendants' conduct, including the failure to comply with applicable Federal standards: was specifically intended to cause substantial injury to Plaintiff; or when viewed objectively from Defendants' standpoint at the time of the conduct, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and Defendants were actually, subjectively aware of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others; or included a material representation that was false, with Defendants, knowing that it was false or with reckless disregard as to its truth and as a positive assertion, with the intent that the representation is acted on by Plaintiff.

141.    Plaintiff relied on the representation and suffered injury as a proximate result of this reliance.

142.    Plaintiff therefore will seek to assert claims for exemplary damages at the appropriate time under governing law in an amount within the jurisdictional limits of the Court.

143.    Plaintiff also alleges that the acts and omissions of named Defendants, whether taken singularly or in combination with others, constitute gross negligence that proximately caused the injuries to Plaintiff. In that regard, Plaintiff will seek exemplary damages in an amount that would punish Defendants for their conduct and which would deter other manufacturers from engaging in such misconduct in the future.

## COUNT VIII: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

27

144.    Plaintiff incorporates herein by reference the allegations in all prior paragraphs as if fully set forth herein.

145.    Defendants carelessly and negligently manufactured, designed, developed, tested, labeled, marketed and sold the Defendants' Bard Hernia Mesh to Plaintiff.

146.    Defendants carelessly and negligently concealed the harmful effects of the Defendants' Bard Hernia Mesh from Plaintiff individually and/or Plaintiff's physician on multiple occasions and continue to do so to this day.

147.    Defendants carelessly and negligently misrepresented the quality, safety and efficacy of Bard Hernia Mesh to Plaintiff individually and/or Plaintiff's physician on multiple occasions and continues to do so to this day.

148.    Plaintiff was directly impacted by Defendants' carelessness and negligence, in that Plaintiff has sustained and will continue to sustain emotional distress, severe physical injuries, economic losses, and other damages as a direct result of the decision to purchase Bard Hernia Mesh sold and distributed by Defendants.

149.    Defendants continued to carelessly and negligently misrepresent the quality, safety, efficacy, dangers and contraindications of Bard Hernia Mesh to Plaintiff individually and/or Plaintiff's physician after Plaintiff sustained emotional distress, severe physical injuries, and economic loss.

150.    Defendants continued to carelessly and negligently misrepresent the quality, safety, efficacy, dangers and contraindications of Bard Hernia Mesh to Plaintiff individually and/or Plaintiff's physician knowing that doing so would cause the Plaintiff to suffer additional and continued emotional distress, severe physical injuries, and economic loss.

28

151.    As a proximate result of the Defendants' conduct, Plaintiff has been injured, sustained severe and permanent pain, suffering, anxiety, depression, disability, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

### COUNT IX: FRAUDULENT CONCEALMENT

152.    Plaintiff incorporates herein by reference the allegations in all prior paragraphs as if fully set forth herein.

153.    At all times relevant hereto, it was known or knowable to Defendants that their Products caused large numbers of complications. Moreover, it was known or knowable to Defendants that the surgical technique and training of implanting physicians was not the cause of the adverse events associated with these devices. It was known or knowable to Defendants that the safety and efficacy of its Bard Hernia Mesh had not been proven with respect to, among other things, the product, its components, its performance, and its method of insertion. It was known or knowable to Defendants that Bard Hernia Mesh was not safe and effective. Defendants continued to represent that its Bard Hernia Mesh was safe and effective.

154.    Despite what was known or knowable to Defendants about the lack of safety and efficacy of its Bard Hernia Mesh, Defendants failed to disclose this information to the Plaintiff, to Plaintiff's physicians, and to the public at large.

155.    At all times relevant hereto, Defendants had the duty and obligation to disclose to Plaintiff and Plaintiff's physicians the true facts concerning Bard Hernia Mesh, that is, that said Bard Hernia Mesh was dangerous and defective, lacking efficacy for its purported use and lacking safety in normal use, and how likely it was to cause serious consequences to users,

29

including permanent and debilitating injuries. Defendants concealed these material facts prior to the time that Plaintiff was implanted with Defendants' Bard Hernia Meshes.

156.     Defendants were under a duty to Plaintiffs to disclose and warn of the defective nature of Bard Hernia Mesh because:

A)  Defendants were in a superior position to know the true quality, safety, and efficacy of its Bard Hernia Mesh;

B)  Defendants knowingly made false claims about the safety and quality of its Bard Hernia Mesh in documents and marketing materials;

C)  Defendants fraudulently and affirmatively concealed the defective nature of Bard Hernia Mesh from the Plaintiff.

157.     The facts concealed and/or not disclosed by Defendants to Plaintiff were material facts that a reasonable person would have considered to be important in deciding whether or not to purchase and/or use the Defendants' Bard Hernia Mesh.

158.     At all times relevant hereto, Defendants willfully, intentionally, and maliciously concealed facts as set forth above from Plaintiff and Plaintiff's physicians with the intent to defraud, as alleged herein.

159.     Defendants intentionally concealed and/or failed to disclose the true defective nature of Bard Hernia Mesh so that Plaintiff would request and purchase the Defendants' Bard Hernia Mesh, and Plaintiff's healthcare providers would dispense, prescribe, and recommend the Defendants' Bard Hernia Mesh, and Plaintiff justifiably acted or relied upon the concealed and/or non-disclosed facts to their detriment.

160.    At all times relevant hereto, neither Plaintiff nor Plaintiff's physicians were aware of the facts set forth above, and had they been aware of said facts, they would not have acted as they did, that is, would not reasonably relied upon said representations of safety and efficacy and utilized Defendants' Bard Hernia Mesh in their treatment. Defendants' failure to disclose this information was a substantial factor in Plaintiff's physicians selecting Defendants' Bard Hernia Mesh. The failure to disclose also resulted in the provision of incorrect and incomplete information to Plaintiff, as a patient.

161.    As a direct and proximate result of this conduct, Plaintiff was injured.

## COUNT X: NEGLIGENT MISREPRESENTATION

162.    Plaintiff incorporates herein by reference the allegations in all prior paragraphs as if fully set forth herein.

163.    Defendants had a duty to accurately and truthfully represent to the medical and healthcare community, Plaintiff, and the public, that its Bard Hernia Mesh had not been adequately tested and found to be a safe and effective treatment. The representations made by Defendants were, in fact, false.

164.    Defendants failed to exercise ordinary care in the representations concerning Bard Hernia Mesh while they were involved in their manufacture, sale, testing, quality assurance, quality control, and distribution in interstate commerce, because Defendants negligently misrepresented Bard Hernia Mesh's high risk of unreasonable and dangerous adverse side effects.

165.    Defendants breached their duty in representing that the Defendants' Bard Hernia Mesh had no serious side effects different from older generations of similar products and/or procedures to Plaintiff, Plaintiff's physicians, and the medical community.

166.    As a foreseeable, direct, and proximate result of the negligent misrepresentation of Defendants, as set forth herein, Defendants knew, and had reason to know, that Bard Hernia Mesh had been insufficiently tested, or had not been tested at all, and that they lacked adequate and accurate warnings, and that they created a high risk—and/or higher than acceptable risk, and/or higher than reported and represented risk—of adverse side effects, including, but not limited to, pain, graft rejection, graft migration, organ damage, complex seroma, fistula, sinus tract formation, delayed wound closure, infection, sepsis, and death.

167.    As a direct and proximate result of the Defendants' conduct, Plaintiff has been injured and sustained severe pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

## PUNITIVE DAMAGES

168.    Plaintiff incorporates herein by reference the allegations in all prior paragraphs as if fully set forth herein.

169.    Defendants failed to adequately test and study Bard Hernia Mesh to determine and ensure that the product was safe and effective prior to releasing the product for sale for permanent human implantation, and Defendants continued to manufacture and sell Bard Hernia Mesh after obtaining knowledge and information that the product was defective and unreasonably unsafe.

170. Even though Defendants have other hernia repair mesh devices that do not present the same risks as Bard Hernia Mesh, Defendants developed, designed and sold Bard Hernia Mesh, and continue to do so, because Bard Hernia Mesh has a significantly higher profit margin than other hernia repair products. Defendants were aware of the probable consequences of implantation of the dangerous and defective Bard Hernia Mesh, including the risk of failure and serious injury, such as suffered by Plaintiff.

171. At all times relevant hereto, Defendants knew or should have known that Bard Hernia Mesh was inherently more dangerous with respect to the risk of migration, foreign body response, allergic reactions, rejection, infection, failure, erosion, pain and suffering, organ perforation, dense adhesions, loss of life's enjoyment, remedial surgeries and treatments in an effort to cure the conditions proximately related to the use of the product, as well as the other severe and personal injuries which are permanent and lasting in nature.

172. Defendants' misrepresentation included knowingly withholding material information form the medical community and the public, including Plaintiff, concerning the safety and efficacy of Bard Hernia Mesh, which deprived Plaintiff and Plaintiff's implanting physicians of vitally necessary information with which to make a fully informed decision about whether to use Bard Hernia Mesh.

173. At all times material hereto, Defendants knew and recklessly and/or intentionally disregarded the fact that the Defendants' Bard Hernia Mesh can cause debilitating and potentially life-threatening side effects with greater frequency than safer alternative methods, products, procedures, and/or treatment.

174.    At all times material hereto, Defendants knew and recklessly and/or intentionally disregarded the fact that Bard Hernia Mesh can cause debilitating and potentially life-threatening side effects with greater frequency than safer alternative products and/or methods of treatment and recklessly failed to advise the medical community and the general public, including Plaintiff, of the same.

175.    At all times material hereto, Defendants intentionally misstated and misrepresented data and continue to misrepresent data so as to minimize the perceived risk of injuries and the rate of complications caused by and associated with Bard Hernia Mesh.

176.    Notwithstanding the foregoing and the growing body of knowledge and information regarding the true and defective nature of Bard Hernia Mesh with its increased risk of side effects and serious complications, Defendants continue to aggressively market Bard Hernia Mesh to the medical community and to consumers without disclosing the true risk of such complications.

177.    At the time the Plaintiff was implanted with Bard Hernia Mesh and since that time, Defendants knew that Bard Hernia Mesh was defective and unreasonably dangerous but continued to manufacture, produce, assemble, market, distribute, and sell Bard Hernia Mesh so as to maximize sales and profits at the expense of the health and safety of the public in a conscious, reckless and/or intentional disregard of the likely and foreseeable harm caused by Bard Hernia Mesh to members of the public including Plaintiff.

178.    At all times material, Defendants have concealed and/or failed to disclose to the public the serious risks and the potential complications associated with Bard Hernia Mesh in

order to ensure continued and increased sales and profits and to the detriment of the public, including Plaintiff.

179.    Defendants' conduct, acts and omissions, as described herein, are of such character and nature so as to entitle Plaintiff to an award of punitive damages in accordance with applicable statutory and common law. Defendants' conduct shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, punitive damages or enhanced compensatory damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## PRAYER FOR RELIEF

Plaintiff demands judgment against Defendants, and each of them, individually, jointly and severally and prays for the following relief in accordance with applicable law and equity:

i.      Compensatory damages to Plaintiff for past, present, and future damages, including but not limited to, pain and suffering for severe and permanent personal injuries sustained by Plaintiff, permanent impairment, mental pain and suffering, loss of enjoyment of life, health and medical care costs, economic damages, together with interest and costs as provided by law;

ii.     Restitution and disgorgement of profits;

iii.    Punitive or enhanced compensatory damages;

iv.     Reasonable attorneys' fees as provided by law;

     v.       The costs of these proceedings, including past and future cost of the suit incurred herein;

     vi.      All ascertainable economic damages;

     vii.     Prejudgment interest on all damages as allowed by law; and

     viii.    Such other and further relief as this Court deems just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Steven C. Babin, Jr.
Steven C. Babin, Jr.    (0093584)
Lance Chapin          (0069473)
Chapin Legal Group, LLC
580 South High Street, Suite 330
Columbus, Ohio  43215
Telephone:    614.221.9100
Facsimile:    614.221.9272
E-mail:        sbabin@chapinlegal.com
              lchapin@chapinlegal.com
Attorneys for Plaintiff